UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard M. MITCHELL, Defendant–
Appellant.

No. 93–5728.

United States Court of Appeals,
Fourth Circuit.

Argued June 10, 1994.

Decided Nov. 3, 1994.

**ARGUED:** Tamara Lee Preiss, Sidley & Austin, Washington, DC, for appellant. David Glenn Barger, Asst. U.S. Atty., Alexandria, VA, for appellee. **ON BRIEF:** Thomas C. Green, Mark D. Hopson, Sidley & Austin, Washington, DC, for appellant. Helen F. Fahey, U.S. Atty., W. Neil Hammerstrom, Jr., Asst. U.S. Atty., Alexandria, VA, for appellee.

Before MURNAGHAN, WILKINS, and WILLIAMS, Circuit Judges.

Affirmed by published opinion. Judge WILKINS wrote the majority opinion, in which Judge WILLIAMS joined. Judge MURNAGHAN wrote a dissenting opinion.

## OPINION

WILKINS, Circuit Judge:

Richard M. Mitchell appeals his conviction of importing merchandise contrary to law in violation of 18 U.S.C.A. § 545 (West 1976). He principally argues that the "contrary to law" provision of § 545 embraces only violations of other acts of Congress, not administrative regulations. In the alternative, he maintains that his felony conviction under § 545 cannot be predicated on administrative regulations for which Congress has provided misdemeanor penalties. We disagree and accordingly affirm Mitchell's conviction.

### I.

Mitchell was employed by the Fish and Wildlife Service of the United States Department of the Interior (FWS). His responsibilities included implementing international wildlife conservation programs, advising persons of the requirements for importing and exporting wildlife, and reviewing import and export applications. Outside his employment at the FWS, Mitchell booked big-game hunting trips to Asia and promoted sport-hunting programs of exotic wild animals.

An acquaintance of Mitchell, Don Cox, travelled to the Punjab Province of Pakistan where he illegally hunted and killed two Punjab urials and a Chinkara gazelle. Because he could not obtain permits from Pakistani wildlife authorities to export the hides and horns, Cox arranged to have Mitchell smuggle them out of Pakistan and into the United States.

On September 25, 1987, Mitchell arrived with the contraband at Dulles International Airport. He completed a United States Customs Service Declaration Form 6059–B (Customs Form 6059–B), but did not declare the hides and horns. Further, Mitchell did not complete a FWS Declaration for Importation or Exportation of Fish or Wildlife Form 3–177 (FWS Form 3–177). And, Mitchell failed to disclose that he was importing untanned animal hides into the United States.

In June 1992, a grand jury returned a nine-count indictment against Mitchell in which he was charged with numerous offenses relating to his business activities and to his bringing the hides and horns into the United States. Count Nine charged Mitchell with violating 18 U.S.C.A. § 545 by importing merchandise contrary to law in that he failed to:

(1) declare the items to a Customs officer as required by 19 C.F.R. § 148.11 (1987) ("the Customs regulation");

(2) file a completed FWS Form 3–177 as required by 50 C.F.R. § 14.61 (1986) ("the FWS regulation"); and

(3) show the country of origin of the hides and horns on a commercial invoice or in some other manner satisfactory to the Deputy Administrator of Veterinary Services as required by 9 C.F.R. § 95.2 (1987) ("the Agriculture regulation").[1]

---

1. Count Nine of the indictment also charged Mitchell with failing to comply with the handling

Mitchell moved to dismiss Count Nine on the grounds that the "contrary to law" provision of § 545 does not embrace violations of administrative regulations and that a felony conviction under § 545 could not be predicated upon a violation of the FWS regulation for which Congress had provided a misdemeanor punishment under 16 U.S.C.A. § 1540(b) (West 1985).[2] The district court denied the motion.

With respect to the regulations set forth in Count Nine, the district court instructed the jury in the disjunctive, stating that it need only find that one of the regulations had been violated in order to convict Mitchell. Mitchell agreed to this instruction. Although Mitchell was acquitted of Counts One through Eight, the jury returned a general verdict of guilt on Count Nine. The district court denied Mitchell's motion for a new trial or in the alternative for a judgment of acquittal, sentenced Mitchell to two years probation, and imposed a $1,000 fine and a $50 special assessment.

## II.

■ Section 545 provides in pertinent part:

> Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law ... [s]hall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C.A. § 545 (West 1976). Mitchell principally contends that the "contrary to law" provision of § 545 embraces only conduct that violates acts of Congress, not conduct that violates administrative regulations. In the alternative, Mitchell contends that the "contrary to law" provision of § 545 is am-

biguous concerning whether it includes violations of regulations and that the rule of lenity therefore should apply. We review de novo the proper interpretation of a statutory provision, including whether the provision is ambiguous. *United States v. Hall,* 972 F.2d 67, 69 (4th Cir.1992).

### A.

■ In determining the scope of the "contrary to law" provision of § 545, we first examine the language of the statute. *Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990). Because the word "law" within the meaning of § 545 is not defined, we must give the word its ordinary meaning. *Id.* "Law" is commonly defined to include administrative regulations. *See Black's Law Dictionary* 796 (5th ed.1979); *see also The Random House College Dictionary* 759 (rev. ed.1980). In concluding that the word "law" in the "authorized by law" provision of 18 U.S.C.A. § 1905 (West 1984) included administrative regulations, the Supreme Court observed:

> It has been established in a variety of contexts that properly promulgated, substantive agency regulations have the "force and effect of law." This doctrine is so well established that agency regulations implementing federal statutes have been held to pre-empt state law under the Supremacy Clause. It would therefore take a clear showing of contrary legislative intent before the phrase "authorized by law" in § 1905 could be held to have a narrower ambit than the traditional understanding.

*Chrysler Corp. v. Brown,* 441 U.S. 281, 295–96, 99 S.Ct. 1705, 1714, 60 L.Ed.2d 208 (1979) (footnotes omitted). Thus, the plain meaning of "law" includes regulations having the force and effect of law.

■ The plain language of the statute will control unless the legislative history demonstrates that Congress clearly intended

---

and treatment requirements of 9 C.F.R. §§ 95.5, 95.6 (1987). However, it appears that the district court charged the jury with only the country of origin requirements of § 95.2. We therefore focus on Mitchell's violation of § 95.2, but note that our analysis would reach the same result with respect to §§ 95.5 and 95.6.

**2.** Mitchell did not raise the same argument with respect to the Agriculture regulation although Congress had also provided for the violation of this regulation to be punished as a misdemeanor.

a contrary meaning. *See Reves v. Ernst & Young,* —— U.S. ——, ——, 113 S.Ct. 1163, 1169, 122 L.Ed.2d 525 (1993). Mitchell contends that the ordinary meaning of the word "law" cannot be applied because when Congress enacted the "contrary to law" provision of § 545 in 1866,[3] regulations were fairly uncommon and thus Congress could not have intended to include administrative regulations. Our review of the available legislative history of § 545 discloses nothing to indicate that Congress clearly intended for the "contrary to law" provision to be limited to statutory violations.[4] Further, the "contrary to law" provision now codified at § 545 was reenacted in 1922 and 1930. *See* Tariff Act of 1922, ch. 356, § 593, 42 Stat. 858, 982 (1922); Tariff Act of 1930, ch. 497, § 593, 46 Stat. 590, 751 (1930).[5] Prior to the 1922 and 1930 reenactments, it was well settled that the word "law" included substantive regula-

tions having the force and effect of law. *See, e.g., Maryland Casualty Co. v. United States,* 251 U.S. 342, 349, 40 S.Ct. 155, 157–58, 64 L.Ed. 297 (1920). Furthermore, the only court to have considered whether the "contrary to law" provision of the predecessor to § 545 encompassed violations of administrative regulations prior to these reenactments concluded that it did. *Estes v. United States,* 227 F. 818, 821–22 (8th Cir. 1915) ("contrary to law" includes regulations lawfully promulgated by the Secretary of Agriculture). "Congress is presumed to be aware of ... judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard, a Div. of Loew's Theatres, Inc. v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) (citations omitted).[6] Because Congress reenacted the predecessor to § 545 with knowledge that the "contrary to

---

3. *See Act of July 18, 1866, ch. 201, § 4, 14 Stat. 178, 179 (1866).

4. We note also that in considering the meaning of the term "law" in the "authorized by law" provision of § 1905, the Supreme Court was untroubled by the fact that Congress had initially adopted the "authorized by law" language in 1864, when no legislative history indicated that Congress intended to limit the meaning of the provision to statutes. *See Chrysler Corp.,* 441 U.S. at 295–98, 99 S.Ct. at 1714–16.

5. Section 593 was later recodified as 18 U.S.C.A. § 545. *See* Act of June 25, 1948, ch. 645, § 545, 62 Stat. 683, 716 (1948).

6. We note that some provisions enacted in the 1922 and 1930 Tariff Acts refer to "law and regulations." The Supreme Court has stated that when " 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972)). However, "[t]he presumption loses some of its force when the sections in question are dissimilar and scattered at distant points of a lengthy and complex enactment." *United States v. Granderson,* —— U.S. ——, ——, 114 S.Ct. 1259, 1272, 127 L.Ed.2d 611 (1994) (Kennedy, J., concurring). We are not persuaded that the existence of these provisions indicates clear congressional intent to limit the meaning of "contrary to law" to statutes. Because the references in the 1922 and 1930

Tariff Acts to "law and regulations" are not used in the context of conduct "contrary to law and regulations," we cannot presume that Congress was acting purposely to exclude regulations from the "contrary to law" provision of § 545. This conclusion is buttressed by the fact that the legislative histories of the 1922 and 1930 Tariff Acts are silent as to the intended effect of new provisions referring to "law and regulations" on § 545. Silence is an unreliable source of legislative intent. *See Zuber v. Allen,* 396 U.S. 168, 185, 90 S.Ct. 314, 323, 24 L.Ed.2d 345 (1969) ("Legislative silence is a poor beacon to follow in" statutory interpretation.); *Symons v. Chrysler Corp. Loan Guarantee Bd.,* 670 F.2d 238, 242 (D.C.Cir.1981) ("Drawing inferences as to congressional intent from silence in legislative history is always a precarious business."). In any event, at best the presumption articulated in *Russello* conflicts with the presumption that Congress adopts judicial interpretations of a statute when it reenacts the statute without change. We are unable to glean clear congressional intent to indicate that the "contrary to law" provision does not encompass administrative regulations on the basis of conflicting presumptions. We therefore conclude that the mere existence of these provisions does not indicate a clear congressional intent to limit the meaning of the "contrary to law" provision of § 545. In the absence of a clear indication that Congress intended these provisions to have some effect on § 545, we will not create an ambiguity by juxtaposing § 545 with those provisions. *See United States v. Blannon,* 836 F.2d 843, 845 (4th Cir.) ("[A] court may not manufacture an ambiguity in order to defeat Congress' intent."), *cert. denied,* 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988).

law" provision had been interpreted to include regulations having the force and effect of law, we cannot conclude that Congress evinced a clear intent that § 545 does not encompass administrative regulations.[7] Thus, we conclude that the "contrary to law" provision is unambiguous.

When ambiguity exists, " 'the ambit of criminal statutes should be resolved in favor of lenity.' " *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (quoting *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971)). However, the rule of lenity does not apply unless a " 'grievous ambiguity or uncertainty,' " *Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991) (quoting *Huddleston v. United States,* 415 U.S. 814, 831, 94 S.Ct. 1262, 1272, 39 L.Ed.2d 782 (1974)), remains even after we have looked to the language, structure, and legislative history of the statute, *Moskal,* 498 U.S. at 108, 111 S.Ct. at 465. Because § 545 is not ambiguous, we decline to apply the rule of lenity.

### B.

Mitchell also claims that the "contrary to law" provision of § 545 does not reach conduct violative of the Customs, FWS, and Agriculture regulations. Because we conclude that § 545 reaches conduct contrary to regulations having the force and effect of law, we must determine whether the regulations on which the Government relied meet this requirement. For regulations to have the force and effect of law they must first be "substantive" or "legislative-type" rules, as opposed to "interpretive rules, general statements of policy, or rules of agency organiza-

tion, procedure, or practice." *Chrysler Corp.,* 441 U.S. at 301–02, 99 S.Ct. at 1717–18 (internal quotation marks omitted). An inherent characteristic of a "substantive rule" is that it is "one 'affecting individual rights and obligations.' " *Id.* at 302, 99 S.Ct. at 1718 (quoting *Morton v. Ruiz,* 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974)). Second, the regulation must have been promulgated pursuant to a congressional grant of quasi-legislative authority. *Id.* Third, the regulation must have been promulgated in conformity with congressionally-imposed procedural requirements such as the notice and comment provisions of the Administrative Procedure Act (APA), 5 U.S.C.A. § 553(b), (c) (West 1977). *See id.* at 303, 99 S.Ct. at 1718.

It is beyond question that the regulations Mitchell was charged with violating affect individual rights and obligations and are therefore substantive rules, satisfying the first prong of the *Chrysler* test. The Customs regulation requires individuals to declare every item brought into the United States. *See* 19 C.F.R. § 148.11. Similarly, the FWS regulation requires persons importing wildlife into the United States to complete, sign, and file a FWS Form 3–177 upon entry at a designated port unless certain exceptions, not relevant here, apply. *See* 50 C.F.R. § 14.61. Finally, the Agriculture regulation prohibits individuals from importing hides and horns into the United States unless country of origin disclosure requirements are met. *See* 9 C.F.R. § 95.2.

We also conclude that the regulations satisfy the second prong of the *Chrysler* test, as they were promulgated pursuant to congressional grants of quasi-legislative authority and do not exceed the scope of those grants of authority. The Customs regulation was

---

**7.** In addition, Mitchell emphasizes that in other statutes Congress has used the phrase "contrary to law or regulation." *See, e.g.,* 10 U.S.C.A. § 618(a) (West Supp.1994); 10 U.S.C.A. § 5898(a) (West Supp.1994); 14 U.S.C.A. § 261(a) (West 1990); 14 U.S.C.A. § 289(f) (West 1990); 14 U.S.C.A. § 290(d) (West Supp.1994); 22 U.S.C.A. § 4131(a)(1)(A) (West 1990); *see also* 10 U.S.C.A. § 905(1) (West 1983) ("contrary to law, custom, or regulation"); 22 U.S.C.A. § 4137(b)(2) (West 1990) ("authorized by laws or regulations"). These statutes relate to Armed

Forces and Coast Guard selection boards, Foreign Service personnel grievances, and prisoner of war conduct under the Uniform Code of Military Justice. Mitchell's citation of these provisions does nothing to advance his claim because the language of these unrelated statutes does not assist us in determining Congress' intent with respect to the meaning of § 545. *See Russello,* 464 U.S. at 25, 104 S.Ct. at 301 ("Language in one statute usually sheds little light upon the meaning of different language in another statute. . . .").

promulgated pursuant to, *inter alia*, 19 U.S.C.A. § 1498 (West 1980 & Supp.1994). *See* 38 Fed.Reg. 2449, 2450 (1973). Section 1498 explicitly authorizes the Secretary of the Treasury "to prescribe rules and regulations for the declaration and entry of ... [a]rticles carried on the person or contained in the baggage of a person arriving in the United States." 19 U.S.C.A. § 1498(a)(7) (West Supp.1994). Thus, we conclude that the Customs regulation, which requires the declaration of "[a]ll articles brought into the United States by any individual," was within the delegation of authority contemplated by Congress in enacting § 1498.

The FWS regulation was promulgated pursuant to, *inter alia*, § 11(f) of the Endangered Species Act of 1973, 16 U.S.C.A. § 1540(f) (West 1985). *See* 45 Fed.Reg. 56,-668, 56,673 (1980). Specifically, § 1540(f) contains an express grant of authority to the Secretary of the Interior "to promulgate such regulations as may be appropriate to enforce [chapter 35 of this title]." 16 U.S.C.A. § 1540(f). Chapter 35 includes a prohibition on the importation of any endangered species of fish or wildlife, including any dead body or part thereof. *See* 16 U.S.C.A. §§ 1532(8), 1538(a)(1)(A) (West 1985). Therefore, we conclude that Congress authorized the promulgation of the FWS regulation and contemplated the requirement that persons bringing game trophies into the United States complete a FWS Form 3–177 so that it can be determined whether those trophies came from endangered species of fish or wildlife.

The Agriculture regulation was promulgated pursuant to 21 U.S.C.A. § 111 (West 1972). *See* 28 Fed.Reg. 5981, 5982 (1963). Section 111 provides:

> The Secretary of Agriculture shall have authority to make such regulations and take such measures as he may deem proper to prevent the introduction or dissemination of the contagion of any contagious, infectious, or communicable disease of animals ... from a foreign country into the

United States ... and to seize, quarantine, and dispose of ... any meats, hides, or other animal products coming from an infected foreign country to the United States.

21 U.S.C.A. § 111. We conclude that in § 111 Congress authorized and contemplated the promulgation of regulations that prohibit the importation of animal products "unless there be shown upon the commercial invoice, or in some other manner satisfactory to the Deputy Administrator, Veterinary Services, the name of the country of origin of such product or material." 9 C.F.R. § 95.2.

Lastly, we examine the process by which the regulations were promulgated to determine whether all procedural requirements imposed by Congress were met. Our review of the relevant entries in the Federal Register reveals that the regulations Mitchell was charged with violating were promulgated in compliance with all applicable procedural requirements. *See* 45 Fed.Reg. 56,668 (1980) (FWS regulation); 38 Fed.Reg. 2448 (1973) (Customs regulation).[8] We therefore conclude that those regulations conform with all applicable procedural requirements and that they satisfy the third prong of the *Chrysler* test. *See Chrysler Corp.*, 441 U.S. at 303, 99 S.Ct. at 1718.

Because the regulations Mitchell was charged with violating affect individual rights and obligations, were authorized and contemplated by appropriate grants of quasi-legislative authority, and were promulgated in conformity with applicable procedural requirements, we conclude that those regulations have the force and effect of law and therefore are encompassed by the "contrary to law" provision of § 545.

### III.

 Finally, Mitchell argues that even if the "contrary to law" provision of § 545 encompasses violations of administrative regulations having the force and effect of law, his § 545 felony conviction cannot be predicated upon a violation of the FWS or Agriculture

---

8. The Agriculture regulation was first codified in 9 C.F.R. § 95.2 (1938) prior to the original enactment of the APA, ch. 324, 60 Stat. 237 (1946), which provided that "no procedural requirement [was] mandatory as to any agency proceeding initiated prior to the effective date of such requirement," § 12, 60 Stat. at 244.

regulations. This is so, he asserts, because Congress has specifically provided misdemeanor penalties for the violation of these regulations.[9] *See* 16 U.S.C.A. § 1540(b) (West 1985) (penalty provision for violations of the Endangered Species Act of 1973 (ESA) and regulations promulgated thereunder); 21 U.S.C.A. § 122 (West Supp.1994) (penalty provision for violations of 21 U.S.C.A. § 111 ("the Agriculture statute") and regulations promulgated thereunder). Therefore, the same conduct cannot be prosecuted as a felony.

 It is well settled that no inherent difficulty exists in Congress' criminalizing the same conduct under two different statutes, one of which provides for misdemeanor and the other felony punishment. *See United States v. Batchelder*, 442 U.S. 114, 122–26, 99 S.Ct. 2198, 2203–05, 60 L.Ed.2d 755 (1979). And, we can discern no significant difference between two statutes which are independently violated by the same conduct and two statutes which are both violated because one statute serves as a predicate to the violation of the other. Thus, because Mitchell's conviction under § 545 is not impermissible in principle, his argument must be that his § 545 conviction is invalid because the subsequently promulgated regulations repealed by implication the applicability of § 545 to his actions.

 At the outset, we note that a "'strong presumption'" exists against repeal by implication, *Blevins v. United States*, 769 F.2d 175, 181 (4th Cir.1985) (quoting *Ely v. Velde*, 451 F.2d 1130, 1134 (4th Cir.1971)), and that it is "'a cardinal principle of statutory construction that repeals by implication are not favored,'" *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976) (quoting *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976)). When two acts touch upon the same subject, both should be given effect if possible, *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939), because the

rationale of the presumption [against implied repeal] ... is not that Congress is unlikely to change the law ... but rather, that Congress "legislate[s] with knowledge of former related statutes," and will expressly designate the provisions whose application it wishes to suspend, rather than leave that consequence to the uncertainties of implication compounded by the vagaries of judicial construction.

*United States v. Hansen*, 772 F.2d 940, 944–45 (D.C.Cir.1985) (quoting *Continental Ins. Co. v. Simpson*, 8 F.2d 439, 442 (4th Cir. 1925)), *cert. denied*, 475 U.S. 1045, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986).

 Thus, a repeal by implication will only be found when there is clear legislative intent to support it. *United States v. Joya–Martinez*, 947 F.2d 1141, 1144 (4th Cir.1991). Or, stated differently, a later act will not repeal an earlier one in the absence of a clear and manifest intention of Congress. *Borden*, 308 U.S. at 198, 60 S.Ct. at 188. A court may find the requisite degree of intent when (1) "'the two acts are in irreconcilable conflict,'" or (2) "'the later act covers the whole subject of the earlier one and is clearly intended as a substitute.'" *Radzanower*, 426 U.S. at 154, 96 S.Ct. at 1993 (quoting *Posadas v. National City Bank of New York*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936)). Mitchell's appeal arguably presents us with the former situation.

 Statutory provisions will not be considered to be in irreconcilable conflict unless there is a "positive repugnancy" between them such that they "cannot mutually coexist." *Radzanower*, 426 U.S. at 155, 96 S.Ct. at 1993. Determination of whether statutes may coexist requires an inquiry into the legislative history and the language of the statutes themselves. *See Morton v. Mancari*, 417 U.S. 535, 550, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974); *see also Joya–Martinez*, 947 F.2d at 1144.

An examination of the legislative histories of the ESA and the Agriculture statute reveals nothing to indicate that either was in-

---

**9.** For purposes of addressing Mitchell's argument, we assume without deciding that the statutes pursuant to which the regulations were pro-mulgated provide only misdemeanor punishment for the violation of those regulations.

tended by Congress to be the exclusive means of prosecuting violations of regulations promulgated pursuant to these Acts. The House and Senate Reports on the ESA, although addressing the general question of penalties for violations, refer only to the penalties provided in the ESA itself; there is no evidence that these penalties were provided as a substitute for prosecution under any other statute. *See* H.R.Rep. No. 412, 93d Cong., 1st Sess. (1973); S.Rep. No. 307, 93d Cong., 1st Sess. (1973), U.S.Code Cong. & Admin.News 1973, p. 2989. Nor does the conference report discuss the relationship of the ESA to other criminal penalties such as § 545. *See* H.R. Conf. Rep. No. 740, 93d Cong., 1st Sess. (1973). Similarly, the legislative history of the Agriculture statute is entirely devoid of any discussion of the applicable penalty provision, 21 U.S.C.A. § 122. *See* H.R.Rep. No. 2819, 57th Cong., 2d Sess. (1902). There is thus no evidence of a congressional intent to repeal the application of § 545 to the acts made criminal by the ESA and the Agriculture statute, much less a clear and manifest intention of Congress to that effect.

We next examine the statutory provisions themselves. One statutory provision will repeal another " 'only if necessary to make the [later enacted law] work.' " *Radzanower*, 426 U.S. at 155, 96 S.Ct. at 1994 (alteration in original) (quoting *Silver v. New York Stock Exch.*, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963)). The continued applicability of § 545 to conduct violative of the regulations in no way impairs the effectiveness of the regulations. Moreover, there is no reason to infer that Congress, simply by later providing for misdemeanor punishment for violations of the FWS and Agriculture regulations under 16 U.S.C.A. § 1540(b) and 21 U.S.C.A. § 122, intended to preclude prosecution for a felony under § 545. Enactment of a statute with a penalty provision differing from a previously enacted statute is not adequate to show that the statutes are in irreconcilable conflict. *See Radzanower*, 426 U.S. at 155, 96 S.Ct. at 1993. "It is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem." *Id.; cf. Batchelder*, 442 U.S. at 122, 99 S.Ct. at 2203 (1979) (holding that repeal by implication does not exist merely because the same conduct is criminalized by two statutes, one of which provides greater punishment).[10]

---

**10.** Mitchell directs our attention to *United States v. Yuginovich*, 256 U.S. 450, 41 S.Ct. 551, 65 L.Ed. 1043 (1921). The *Yuginovich* Court held that § 35 of the Volstead Act implicitly repealed certain revenue statutes, relying in part on the proposition that a later statute, applying to the same conduct and providing a lesser penalty, supersedes an earlier statute providing a greater penalty. It is somewhat unclear from the text of the opinion whether the Court concluded that repeal by implication resulted because the provisions were in irreconcilable conflict or because the Volstead Act covered the whole subject matter of and was intended as a substitute for the revenue statutes. Nevertheless, *Yuginovich* does not control our analysis regardless of which interpretation is correct. To the extent that *Yuginovich* held that the existence of a less severe penalty was conclusive evidence of an irreconcilable conflict between two statutory provisions, it has been overruled by *Batchelder*. Although *Batchelder* involved two contemporaneously-enacted statutes that provided different penalties for the same conduct, the Court clearly held that differing penalty provisions alone do not evidence a positive repugnancy between penal statutes. *Batchelder*, 442 U.S. at 122, 99 S.Ct. at 2203. However, it is much more likely that the *Yuginovich* Court held that the Volstead Act repealed the revenue statutes dealing with alcohol because the former was a comprehensive enactment intended as a substitute. Neither the Government nor Yuginovich claimed that any provision of the Volstead Act was in direct conflict with the revenue statutes. *Yuginovich*, 256 U.S. at 452–53, 457. Rather, Yuginovich argued to the Court that the Volstead Act "comes within the rule that a statute covering the whole subject-matter of a former one ... operates ... by way of substitution, and impliedly repeals the former." *Id.* at 457. The Court apparently adopted this view, referring to the radical policy change effected by the "comprehensive" Eighteenth Amendment and legislation thereunder. *See id.* at 459–60, 41 S.Ct. at 552–53. The Court then construed the language of § 35 "in view of" the Eighteenth Amendment and the Volstead Act and concluded that Congress did not intend to preserve the applicability of the revenue statutes after passage of the Volstead Act. *Id.* at 463–64, 41 S.Ct. at 554. The relationship between the Volstead Act and the revenue statutes is dissimilar to the relationship between § 545, the ESA, and the Agriculture statute. These statutes deal with different subject matters and overlap only in particular factual situations. *See United States v. Radetsky*, 535 F.2d 556, 567–68 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976). And, there is no indication that the ESA and the Agriculture statute are intended as substitutes for

Our decision that the ESA and the Agriculture statute do not repeal by implication the applicability of § 545 to Mitchell's conduct is in accord with the majority of cases dealing with repeal by implication in the context of a later enactment providing a lesser penalty for the same conduct subject to greater punishment under an earlier statute. *See, e.g., United States v. Hansen,* 772 F.2d 940, 943–49 (D.C.Cir.1985) (finding that later enactment of the Ethics in Government Act of 1978, providing civil penalty for violations, did not repeal by implication the applicability of 18 U.S.C.A. § 1001 (West 1976), providing for felony punishment, to fraudulent financial disclosure report); *United States v. Gordon,* 548 F.2d 743, 744 (8th Cir.1977) (later enactment of statute providing misdemeanor penalty for Medicare fraud did not preclude felony prosecution under § 1001); *United States v. Burnett,* 505 F.2d 815, 816 (9th Cir.1974) (per curiam) (holding later enactment of statute providing misdemeanor penalty for false statements to obtain unemployment benefits for prior federal service did not preclude felony prosecution under § 1001), *cert. denied,* 420 U.S. 966, 95 S.Ct. 1361, 43 L.Ed.2d 445 (1975); *Roseman v. United States,* 364 F.2d 18, 24–27 (9th Cir. 1966) (finding that later enactment of the Federal Food, Drug, and Cosmetics Act of 1938, which provided misdemeanor penalty for violations, did not repeal by implication the applicability of § 545 to the importation of inadequately labelled LSD), *cert. denied,* 386 U.S. 918, 87 S.Ct. 879, 880, 17 L.Ed.2d 789 (1967); *United States v. Kushner,* 135 F.2d 668, 670–71 (2d Cir.) (finding that later enactment of the Gold Reserve Act did not repeal by implication the application of the predecessor to § 545 to the importation of gold bullion), *cert. denied,* 320 U.S. 808, 64 S.Ct. 32, 88 L.Ed. 488 (1943). *But see United States v. Omirly,* 488 F.2d 353, 356–57 (4th Cir.1973) (finding repeal by implication where Congress later reduced the penalty in one statute from a misdemeanor to a civil fine but failed to similarly amend a parallel provision in the statute of conviction); *United States v. Mueller,* 178 F.2d 593, 594 (5th Cir.1950) (affirming dismissal of indictment charging violation of § 545 for importation of lottery tickets based on the conclusion that subsequent enactment of statute dealing specifically with lotteries and lottery tickets, and providing for lesser punishment, indicated legislative intent to withdraw lottery tickets from the purview of the predecessor to § 545).[11]

Even if we were to determine that a conflict existed among § 545, the ESA, and the

---

§ 545. *Id.* We therefore conclude that to the extent that the *Yuginovich* Court held that the Volstead Act implicitly repealed the revenue statutes because it was a comprehensive enactment providing a lesser penalty, it is inapposite to Mitchell's appeal.

11. Our decision in *United States v. Omirly,* 488 F.2d 353 (4th Cir.1973), is not controlling. Omirly was convicted of making a false bomb threat while attempting to board an aircraft in violation of 49 U.S.C.A. § 1472(m)(1) (West 1976), a misdemeanor. Omirly contended that she should have been prosecuted under 18 U.S.C.A. § 35(a) (West 1969) because it also criminalized her conduct, but had been amended to provide only a civil fine for violations, thus indicating congressional intent to repeal the applicability of § 1472(m)(1) to her conduct. This court agreed, resting our decision on two indications of congressional intent. First, we concluded that the legislative history of § 35(a) indicated intent to repeal § 1472(m)(1) as applied to Omirly's conduct. The expressed view of the Department of Justice, adopted by Congress in amending § 35(a), was that providing only a civil penalty for nonmalicious false bomb threats would increase the likelihood of achieving punishment in cases where juries would be reluctant to find the defendant criminally liable. As noted above, we are not blessed with the kind of clear statement of legislative purpose that informed the decision of this court in *Omirly.* Second, *Omirly* rested on the conclusion that the two statutes were "repugnant in their provisions for criminal procedures and possible incarceration on the one hand as against a civil proceeding with a maximum penalty of $1000 on the other." *Omirly,* 488 F.2d at 357. This basis for the *Omirly* decision is no longer valid in light of the subsequent ruling of the Supreme Court in *Batchelder,* which indicates that prosecution of Omirly under § 1472 was not improper merely because § 35(a) provided a lesser penalty. *See Batchelder,* 442 U.S. at 122, 99 S.Ct. at 2203; *see also Radzanower,* 426 U.S. at 155, 96 S.Ct. at 1993–94. In addition, the result in *United States v. Mueller,* 178 F.2d 593 (5th Cir.1950), which apparently gleaned congressional intent to repeal the predecessor to § 545 with respect to the importation of lottery tickets based on Congress' later enactment of a provision dealing specifically with lottery tickets and providing for a lesser penalty, is also undermined by *Batchelder* .

Agriculture statute, § 545 would control as the more specific statute. *See Farmer v. Employment Sec. Comm'n of N.C.*, 4 F.3d 1274, 1283 (4th Cir.1993) (when statutes are in irreconcilable conflict, "statutes narrowly applicable to the circumstances at hand control over more generalized provisions"); *see also Roseman*, 364 F.2d at 25 (examination of dates of enactment and relative specificity only appropriate when statutes are in conflict). The reasoning of *Callahan v. United States*, 285 U.S. 515, 52 S.Ct. 454, 76 L.Ed. 914 (1932), persuades us that the regulations promulgated pursuant to the ESA and the Agriculture statute are not more specific than § 545 when applied to Mitchell's conduct. Callahan challenged his conviction under § 593 of the Tariff Act (the predecessor to § 545) for importing intoxicating liquors contrary to law. He claimed he should have been prosecuted under the National Prohibition Act rather than § 593, because the National Prohibition Act dealt only with liquor, including its importation, and provided a lesser penalty. The Court rejected this argument, concluding that although the National Prohibition Act dealt specifically with liquor, the relevant penalty provision of the Act applied generally to many violations of the Act and did not provide a specific penalty for importation. Section 593 applied only to importation, and was therefore the more specific statute. *Callahan*, 285 U.S. at 517–18, 52 S.Ct. at 455; *see also Murray v. United States*, 217 F.2d 583, 585 (9th Cir.1954) (holding that penalty for importation of merchandise contrary to law under § 545 is more specific than general misdemeanor penalty provided for violations of regulations prohibiting the importation of psittacine birds, regardless of when each provision was enacted). Likewise, the penalty provisions relevant to violations of regulations promulgated pursuant to the ESA, 16 U.S.C.A. § 1540(b), and to violations of regulations promulgated pursuant to the Agriculture statute, 21 U.S.C.A. § 122, apply generally to any violation of the statutes or regulations promulgated thereunder; no specific penalties are provided for importation.[12] These general penalty provisions are like the penalty provision in the National Prohibition Act in that they provide the measure of punishment for numerous violations, including importation. As in *Callahan*, these provisions cannot be said to supersede the specific penalty provided in § 545 for importation of merchandise contrary to law.[13]

Our conclusion that there is no irreconcilable conflict between § 545 and the FWS and Agriculture regulations is further supported by the fact that the goals of § 545, the ESA, and the Agriculture statute are not in conflict. *Cf. United States v. Fausto*, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (finding repeal by implication of previous "patchwork" review scheme for personnel actions because its continued application would subvert the purposes of a subsequently-enacted, comprehensive review scheme); *Roseman*, 364 F.2d at 25. The clandestine intro-

---

**12.** Section 1540(b) provides, in relevant part:

> Any person who knowingly violates any provision of this chapter, of any permit or certificate issued hereunder, or of any regulation [promulgated under] ... section 1538 of this title shall, upon conviction, be fined not more than $20,000 or imprisoned for not more than one year, or both. Any person who knowingly violates any provision of any other regulation issued under this chapter shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than six months, or both.

> 16 U.S.C.A. § 1540(b)(1).

> Section 122 provides, in relevant part:

> Any person ... knowingly violating the provisions of this Act or the orders or regulations made in pursuance thereof shall be guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dollars nor more than five thousand dollars, or

by imprisonment for not more than one year, or by both such fine and imprisonment.

21 U.S.C.A. § 122.

**13.** Mitchell also refers the court to *Palmero v. United States*, 112 F.2d 922 (1st Cir.1940). However, *Palmero* is inapposite. It held that the importation of opium could not be punished under the predecessor to § 545 because the legislative history of the subsequent Opium Act clearly indicated that Congress intended to withdraw opium from the term "merchandise." *Id.* at 925. The court concluded that the predecessor to § 545 did not apply to Palmero's conduct and thus could not conflict with the Narcotic Drugs Import and Export Act or give rise to the possibility of a repeal by implication. *Id.* Nothing in the legislative history of either the ESA or the Agriculture statute indicates an intent to withdraw the hides and horns of dead animals from the term "merchandise" in § 545.

duction of any merchandise into the United States or the importation of any merchandise in a manner contrary to law is punishable under § 545. As its language indicates, § 545 has the rather broad purpose of punishing violations of law respecting the importation of goods. The goals of the ESA are to provide a means of conserving endangered species and the ecosystems they inhabit and to achieve the purposes of certain treaties respecting endangered species. 16 U.S.C.A. § 1531(b) (West 1985). Rather than clashing with the purposes of the ESA, § 545 clearly furthers those purposes by providing an alternative scheme of punishment that is intended to deter importation of wildlife in violation of the ESA. Similarly, the Agriculture statute is intended to "prevent the introduction or dissemination of the contagion of any contagious, infectious, or communicable disease of animals ... into the United States." 21 U.S.C.A. § 111. Allowing punishment under § 545 for the importation of hides and horns without meeting the country of origin requirement of the Agriculture regulation can only be said to further the purposes of the Agriculture statute. The purposes of § 545 and the regulations promulgated pursuant to the ESA and the Agriculture statute thus are not contradictory and, in fact, are complementary.

In sum, we conclude that the regulations promulgated pursuant to the ESA and the Agriculture statute do not implicitly repeal the application of 18 U.S.C.A. § 545 to Mitchell's actions.[14]

## IV.

We hold that the "contrary to law" provision of § 545 encompasses substantive or legislative-type regulations that have the force and effect of law, and that the provision of a misdemeanor penalty for violations of the FWS and Agriculture regulations does not preclude prosecution under the felony provision of § 545.

*AFFIRMED.*

14. We have carefully reviewed Mitchell's other enumerations of error and find them to be without merit.

MURNAGHAN, Circuit Judge, dissenting:

When, as here, a defendant does something unpleasant, and does it in an underhanded way, the inclination is to uphold his conviction. However, I do not believe that is the proper and acceptable course when the statute under which he was convicted does not reach him. Accordingly, I respectfully dissent, even though applying the law correctly would lead to a non-serendipitous result.

"The way to remove a fantastic measure from the Statute Book is *not to evade or ignore it but to enforce it.* ..."[1] It is not irrational to require Congress, if it means something, to say it. The language of the statute under which defendant Richard M. Mitchell was convicted, 18 U.S.C. § 545, prohibits importation into the United States in a manner "contrary to law." The question presented here is whether law means only statutory law or whether it also extends to Customs Service, Fish and Wildlife Service, and Department of Agriculture regulations. I am in basic agreement with the majority view that if "a conflict existed among § 545, the ESA, and the Agriculture statute, § 545 would control as the more specific statute." Maj. op. at 474–75. Where our ways part is in determining whether § 545 itself is ambiguous. When ambiguity exists, "the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (quoting *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971)). For the rule of lenity to apply, the ambiguity or uncertainty must be grievous. *Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991); *Huddleston v. United States,* 415 U.S. 814, 831, 94 S.Ct. 1262, 1271–72, 39 L.Ed.2d 782 (1974). Unlike the majority, I conclude that it is grievously ambiguous whether failure to comply with a regulation is included within the statutory phrase "contrary to law," and that the rule of lenity

1. A. P. Herbert, *Uncommon Law* 313 (7th ed.1950) (quoting from *Rex v. The Minister for Drains* ).

should therefore be applied in Mitchell's case.

First, it must be realized that there are two distinct questions to be addressed. One is whether the regulations involved have the force of law. That regards essentially an issue of whether constitutional power existed in Congress to treat the regulations as law, *i.e.*, whether the regulations are legislative in nature. The majority devotes considerable time to an effort to establish, for that jurisdictional question, that the regulations are law. I am willing, *arguendo*, to accept the reasoning of the majority on that point, but I would dismiss it as irrelevant.[2] I say that because the government has not provided an answer to the second question, namely what the intention, *i.e.*, the meaning, of "law" is in the statutory "contrary to law" language in § 545. An answer that "law" in § 545 also means "regulation" (which does not appear anywhere in § 545), and thus that "law"

comes from nonstatutory sources, is necessary for the government to prevail.

Giving little attention[3] to the confusion necessarily arising from the fact that many statutes say "law and regulations"[4] and yet § 545 says only "contrary to law," the majority relies on *Estes v. United States*, 227 F. 818 (8th Cir.1915),.but does not refer to other language in the same case pointing to a different conclusion as to the meaning of "contrary to law" in § 545.[5]

The government has also cited the case of *United States v. Lee*, 937 F.2d 1388 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 977, 117 L.Ed.2d 141 (1992). It is not readily apparent, however, what view *Lee* supports. *Lee* affirmed convictions for the illegal importation of salmon in violation of the Lacey Act, 16 U.S.C. §§ 3371–78, where the defendant's actions violated a Taiwanese regulation. The applicable penalty provision,

---

2. The three cases relied on, *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993); *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); and *Maryland Casualty Co. v. United States*, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297 (1920), were all civil, not criminal, cases and hence did not address the lenity issue, which for me is the central issue here. It is interesting to note that "[i]n determining the scope of a statute," *Reves*, —— U.S. at ——, 113 S.Ct. at 1169, the Supreme Court chose to "mark the limits of what the term might mean by looking again at what Congress did *not* say." *Id.* at ——, 113 S.Ct. at 1170. In looking again at § 545, I note that Congress did not say "regulation."

3. The majority merely states that "[l]anguage in one statute usually sheds little light upon the meaning of different language in another statute," maj. op. at 470 n. 7 (quoting *Russello v. United States*, 464 U.S. 16, 25, 104 S.Ct. 296, 301, 78 L.Ed.2d 17.(1983)), yet takes the supposed meaning of § 545 from the promulgated regulations rather than from the enacted statute itself.

4. *See, e.g.*, 10 U.S.C. § 618(a)(1); 10 U.S.C. § 5898(a); 14 U.S.C. § 261(a); 14 U.S.C. § 289(f); 14 U.S.C. § 290(d); 22 U.S.C. § 4131(a)(1)(A); 22 U.S.C. § 4137(b)(2); *see also* 10 U.S.C. § 905(1) ("contrary to law, custom, or regulation"); 30 U.S.C. § 823(d)(2)(A)(ii)(III) ("contrary to law or to ... duly promulgated rules or decisions....").

5. The *Estes* case, while a regulation was involved, provided no discussion about whether regulations and statutes have different dignity

vis-a-vis § 545. However, the court had to distinguish *United States v. Eaton*, 144 U.S. 677, 688, 12 S.Ct. 764, 767, 36 L.Ed. 591 (1892), which held that "if Congress had intended that a violation of the regulations promulgated by the Commissioner of Internal Revenue should be visited by the penalty imposed by section 18 of the act [punishing omission, neglect or refusal to do certain things required by law], it would have said so.'' *Estes*, 227 F. at 821. (The exact words of the *Eaton* Court are perhaps even more compelling: "If Congress intended to make [violation of the regulations] an offence, ... *it would have done so distinctly*." *Eaton*, 144 U.S. at 688, 12 S.Ct. at 767 (emphasis added).)

*Estes* distinguished *Eaton* without referring to the question which attracts our attention here by relying on *United States v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911), which held that "a conviction for violating the regulations established by the Secretary of Agriculture, regulating the use of forest reservations for grazing and other lawful purposes, should be sustained because *the act of Congress* which authorized the Secretary to establish the regulations also *provided that any violation of the provisions of the act or of such rules and regulations should be punished* as provided in section 5388 [of the Revised Statutes], as amended." (emphasis added). *Estes*, 227 F. at 821. In the instant case there is no such statutory reference to regulations upon which we can rely. *See United States v. Ivey*, 949 F.2d 759 (5th Cir.1991) (in which the issue of whether "contrary to law" in § 545 included "regulations" was not even discussed), *cert. denied*, —— U.S. ——, 113 S.Ct. 64, 121 L.Ed.2d 32 (1992).

§ 3372(a)(2), criminalized importations in violation of "any law or regulation of any State or in violation of any foreign law." *Id.* at 1391. The Court noted the "broad definition of the word 'law'" and held that, as with a United States regulation, a foreign regulation was a law for the purposes of section 3372(a)(2). *Id.* However, in making its determination, the Ninth Circuit noted that "[b]ecause the criminal culpability requirements make reference to regulations," it could infer that a foreign regulation also fell within the ambit of the Lacey Act. *Id.* at 1392.

First, *Lee* itself, in its illumination of the statutory language of the Lacey Act, underscores the absence of similar language in § 545. The former speaks of laws and of regulations, while the latter speaks only of law. Second, it was the very inclusion of the term "regulation" that enabled the *Lee* court to infer that Congress intended convictions under the Lacey Act to be premised on foreign, as well as on domestic state regulations. *Id.* at 1391. Third, the *Lee* court noted that the provision of 16 U.S.C. § 3373(d)(1)-(2) that assigns criminal liability once the substantive portion of the Lacey Act has been violated, encompasses knowing violations of "any underlying law, treaty, or regulation." *Id.* at 1392. It was reasoned that since Congress would have intended foreign "law" to have the same meaning throughout the statute, "law" should be read to include foreign regulations. *Id.* Finally, the Ninth Circuit noted that the legislative history suggested that Congress, in re-enacting the Lacey Act, specifically intended to broaden the scope of the Act, thereby including the term "regulation." *Id.* at 1391. Notably to the

contrary, when Congress re-enacted the language contained in § 545, it made no change incorporating any reference to "regulation."

The foregoing cases constitute further evidence of the ambiguity and uncertainty surrounding the phrase "contrary to law," since none of them provides definitive guidance in the choice between "contrary to law" on the one hand and "law and regulations" on the other.[6]

Hence, returning to the language of the statute, the meaning of "contrary to law" has not been unambiguously established. Certainly, defendant Mitchell goes too far in asserting that the statute's *plain* meaning is that it refers only to "statutes" and not "regulations," and his argument must be rejected.[7] Section 545 is unarguably ambiguous. The operation of § 545 as well as other statutes, such as the Lacey Act, and of the relevant regulations, creates arguments on both sides. We are faced with a close question with no sure answer.

Hence, the question arises whether the rule of lenity should obtain and § 545 should be interpreted to Mitchell's benefit. *See Smith v. United States,* —— U.S. ——, ——, 113 S.Ct. 2050, 2059, 124 L.Ed.2d 138 (1993) ("venerable rule [of lenity] is reserved for cases where, after seizing every thing from which aid can be derived, the Court is left with an ambiguous statute") (citation and internal quotation omitted); *Chapman,* 500 U.S. at 463, 111 S.Ct. at 1926 (rule of lenity "not applicable unless there is a grievous ambiguity or uncertainty in the language and

---

**6.** The cases relied on by Mitchell are equally unilluminating as to whether or not § 545's "contrary to law" language extends to "regulations." But they contribute abundantly to the creation of ambiguity. *See, e.g., Keck v. United States,* 172 U.S. 434, 437, 19 S.Ct. 254, 255, 43 L.Ed. 505 (1899) ("The words 'contrary to law,' contained in the statute, clearly relate to legal provisions not found in section 3082 itself, but we look in vain in the count for any indication of what was relied on as violative of the *statutory* regulations concerning the importation of merchandise .... because importing merchandise is not *per se* contrary to law, and could only become so when done in violation of specific *statutory* requirements.") (emphasis added). One sees additional ambiguity in a statement in *Lee,* 937

F.2d at 1397 ("Thus, one must always look to another *statute,* such as the Act, to determine whether a violation of section 545 has taken place.") (emphasis added). There is still more ambiguity in *Palmero v. United States,* 112 F.2d 922, 925 (1st Cir.1940) ("The penalty imposed under [the statute] is for acts committed 'contrary to law' and to ascertain what is contrary to law reference must be made to some other *statutory* provision.") (emphasis added). None of those cases expressly addresses the question of whether § 545 is intended to cover statutes only, *not including regulations.*

**7.** If it takes two to tango, the same may be said of the creation of an ambiguity.

structure of the Act") (citation and internal quotation omitted).

We have here no such aid to assist our discovery of § 545's meaning. Hence the cases reveal grievous ambiguity or uncertainty. It is as though the word "day" appeared in a criminal statute with no indication whatsoever whether (a) twenty-four hours or (b) the period of daylight (excluding night) was intended. Ours is a similar ambiguity and leads us to the conclusion that § 545's phrase "contrary to law," involving the definition of a crime, when the "lenity" principle is applied, does not include regulatory violations.

In my judgment, the conviction under Count Nine should be reversed and, therefore, I respectfully dissent.