In the Matter of Samuel Andrew McNEE-LY f/d/b/a McNeely & McNeely Logging, a partnership, Debtor.

Samuel Andrew McNEELY, Plaintiff,

v.

HUTCHISON FINANCIAL CORPORATION OF AUGUSTA, d/b/a Southland Timber Company, Defendant.

Bankruptcy No. 686–00172.
Adv. No. 687–0008.

United States Bankruptcy Court,
S.D. Georgia,
Statesboro Division.

Dec. 19, 1987.

Jesse C. Stone, Swainsboro, Ga., for plaintiff/movant.

J. Benjamin Kay, III, Augusta, Ga., for defendant.

## MEMORANDUM AND ORDER

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

On July 29, 1987, the complaint of Plaintiff, Samuel Andrew McNeely, was heard.[1] The Plaintiff enumerates six counts in his complaint upon which he seeks to recover for alleged pre-petition preferences (§ 547), post-petition transfers (§ 549) and allegedly discriminatory termination of employment (§ 525). The Plaintiff also seeks a determination of the secured status of Hutchison [§ 506(a)].

## FINDINGS OF FACT

Plaintiff is a logger who filed for protection under Chapter 11 of the Bankruptcy Code on August 4, 1986. Defendants, Hutchison Financial Corporation ("Hutchison") and Canal Wood Corporation of Augusta, d/b/a Southland Timber Company ("Southland"), are respectively a creditor and a former employer of the Plaintiff.

Plaintiff was employed by Canal Wood as an independent contractor hired to cut and haul wood. For the three years preceding February, 1987, the Plaintiff worked exclusively for Canal Wood. The employment relationship of the Plaintiff and Canal Wood was carefully structured so as to create an independent contractor relationship by which Canal Wood could shield itself from liability. Notwithstanding their "independent" relationship, Canal Wood typically made recommendations regarding the type of equipment to be purchased by the logger and where it could be purchased. Canal Wood, moreover, assists its loggers who have limited credit in obtaining financing from its sister corporation, Hutchison Financial, for the purchase of the recommended equipment.

The ordinary course of financing by Hutchison includes obtaining the consent of the loggers to have weekly payments deducted by Canal Wood. Payments are routinely withheld from loggers by Canal Wood for the benefit of Hutchison. It is not uncommon for indulgences or debt restructuring to be granted by Hutchison upon the recommendations of Canal Wood's field managers.

Consistent with the parties ordinary course of business, Hutchison loaned the Plaintiff some $166,000.00 in 1983.

On March 7, 1986, the Plaintiff signed a promissory note to Hutchison for $48,-296.37 which required $1,051.10 in weekly payments (Exhibit P-7). Then on July 18, 1986, Plaintiff signed a promissory note to Hutchison for $30,576.61 which required $837.91 in weekly payments. (Exhibit P-6)[2] Under the terms of the March and July notes, Plaintiff gave Hutchison a security interest in:

1) 1983 Timberjack 350 Grapple Skidder, Serial # 351389

2) Clark Bobcat Model # 1080B, Serial # 12002

3) 210 Prentice Loader, Serial # 200077705

Hutchison perfected its security interest in the Prentice Loader and Clark Bobcat on September 23, 1983. Hutchison, however, did not perfect its security interest in the Timberjack 350 until August 1, 1986, a scant three days before the Debtor filed his Chapter 11 petition.[3]

As determined by this Court's Order on Motion for Relief from Stay dated May 15,

---

1. At the close of the evidence, the Court instructed the parties to submit proposed findings of fact and conclusions of law. The parties requested 2 weeks time in which to do so following the preparation of a transcript of the evidence, which request was granted. At a later time, counsel notified the Court that due to the expense, they would proceed without a transcript and were told to file their proposed findings. Plaintiff's final proposed findings were filed October 2, 1987.

2. The March 7, 1986, and July 18, 1986, notes appear to be refinancing of the 1983 note. Testimony, however, was unclear on this point.

3. First National Bank of Louisville has a first priority security interest in the Timberjack 350 by virtue of its April 22, 1986, financing statement. First National also has a second priority security interest in the Prentice Loader and Bobcat.

1987, the value of the collateral as of April 9, 1987, was:

| | |
|---|---|
| Timberjack Skidder 350 | $12,000.00 |
| Bobcat Model 1080B | $24,250.00 |
| 210 Prentice Loader | $10,000.00 |

On July 18, 1986, Plaintiff signed a letter, prepared by Hutchison, which authorized Southland to withhold payments from his weekly settlement. (Exhibit P–2).

The parties stipulate that Southland withheld from Plaintiff's weekly settlement:

1) $44,781.20 between 90 days and one year before the date of the filing of the petition;

2) $12,897.52 on or within 90 days of the filing of the petition; and

3) $14,029.58 from the date of the filing of the petition through February, 1987.

All sums were applied to the Plaintiff's pre-petition debt to Hutchison. The funds from which Southland withheld payments were profits generated by the Plaintiff's sole proprietorship through the effort of the employees under his management and use of the equipment of the business. The wood settlement statements reflect the weekly payment made to the Plaintiff's proprietorship prior to deduction of the costs of business, including the salary he paid to himself for his personal services in the logging enterprise.

Typically, Southland assigned its contractor-loggers, including the Plaintiff, specified tracts of land on which to cut timber. Southland's practice was to assign daily logging quotas for its contractors. The amount of a logging quota depended upon the market conditions. When the timber mills were closed the contractors, including the Plaintiff, received no quota. When the demand for timber was low, Southland reduced the size of each individual quota, giving a smaller than usual quota to each logger. After filing his petition, McNeely continued to receive quotas from Southland Timber.

On August 11, 1986, the Plaintiff, acting in his capacity as debtor-in-possession, and Southland Timber entered into a cut and haul contract (Exhibit P–4). The contract specified the tract of land from which the Plaintiff could cut timber, required him to maintain insurance on his equipment and to have liability insurance, and specified the conditions under which Southland Timber could terminate the contract, including violation of the terms of the contract and poor performance. The contract specifically stated that the Plaintiff was an independent contractor, not an employee.

In February, 1987, one month after the Plaintiff filed his Chapter 11 plan and disclosure statement, he was refused any quota and told by Southland Timber that there would be no more quotas. The plan proposed to pay Hutchison a 9½% rate of interest on the Plaintiff's debt to Hutchison. The contractual rate of interest had been 17½%.

Prior to being told that he would receive no more quotas, the Plaintiff experienced several difficulties with his business. He had equipment problems which if left unrepaired would impair his ability to perform under the contract. He also had allowed his insurance coverage to lapse. Nevertheless, he continued to request quotas for cutting from Southland Timber. Southland offered to extend McNeely funds to acquire new insurance, but refused to assist in having his equipment repaired.

Despite the Plaintiff's impaired capability to perform under the contract, Southland Timber did not formally terminate the contract. Instead, Southland flatly told him he would get no more quotas.

Prior to filing, Debtor earned a profit of $5,000–$7,000 per month, based on Debtor's testimony and his 1985 tax return. (Exhibit P–5). An analysis of the Debtor's monthly statements filed with this Court shows that his post-petition income, *before debt service* dropped from approximately $2,000 to $1,000 per month after the quota was terminated. At the time the quotas were ceased there were five months remaining on the cut and haul contract.

## IV. Discrimination—Count VI ■

■ To prove a private employer's discrimination under Section 525(b), a debtor must show that he or she suffered either termination of his or her employment or discrimination with respect to his or her employment solely because he or she was a debtor, was insolvent, or had a debt dischargeable under Title 11. 11 U.S.C. § 525(b). In this case the Plaintiff has sufficiently shown that Southland Timber discriminated against him with respect to employment solely because he owed a debt dischargeable under bankruptcy law, and Southland Timber's protestations to the contrary are unpersuasive.

### 1. *McNeely and Southland Timber had an Employment Relationship Within the Meaning of § 525(b)'s Provisions*

■ Southland Timber has argued and presented evidence to the effect that McNeely was simply an independent contractor hired by Southland Timber, not an employee. Indeed, the cut and haul contract the two entered into plainly states that McNeely was hired solely as an independent contractor and that Southland Timber could in no way exercise control over the details of McNeely's operation. McNeely, on the other hand, has attempted to counter whatever impact this might have through evidence tending to show that his relationship with Southland Timber was such that a third party could hold Southland Timber responsible for McNeely's torts arising in the scope of his employment, regardless of his ostensible status as an independent contractor. The parties have obviously proceeded as if the word "employment" is used in Section 525(b) to refer to the legal relationship of the employer-employee under state law. This position is inaccurate. The distinction between an employee and an independent contractor is essential in allocating potential tort liability under state tort law, but for purposes of federal bankruptcy law the distinction is largely irrelevant.

■ With the enactment of Section 525(b), Congress attempted to remove a perceived impediment to the fresh start given debtors availing themselves of bankruptcy law's protections. The anti-discrimination provisions of Section 525 forbids private employers from taking discriminatory action against a debtor. Congress' purpose in doing this is abundantly clear: Detors under the Bankruptcy Code are to be given a fresh start in their financial lives, and private employment practices which circumvent this policy are intolerable.

With this national policy in place, it would be peculiar indeed if Congress intended that the word "employment" as used in Section 525(b) parallel the meaning of that legal term of art under state law. Shrewd employers, fearing possible liability, can easily structure their hiring practices to minimize the number of people in their hire who are "employees". Since the success of any debtor's fresh start depends in great measure upon his or her continued employment, it is difficult to believe that Congress gave the anti-discrimination protections only to those who are found to be part of an "employer-employee" relationship after an examination of the doctrine of respondent superior as used by the several states.

A better view of Section 525(b) recognizes that Congress included all private employment relationships in the anti-discrimination provisions. As a result, the fact that McNeely could be denominated an independent contractor under state law is no obstacle to McNeely's claim.

### 2. *Southland Timber Discriminated Against McNeely with Respect to Employment Solely Because McNeely had a Debt Dischargeable in Bankruptcy*

The parties are in disagreement as to whether Southland Timber terminated McNeely. From the record it appears that Southland Timber never formally terminated its cut and haul contract with McNeely despite Southland's refusal to give McNeely any more quotas for timber. Technically, at least, the contract and the employment relationship it established remained in

force after the timber quotas ended in February 1987.

■ Termination of employment, however, is not the only action which triggers the protections of Section 525(b). The section also forbids discrimination with respect to employment. Thus, the court in *In re Hicks*, 65 B.R. 980 (Bankr.W.D.Ark. 1986) found that a private employer discriminated against a debtor by transferring her from a position having contact with the public to a non-contact position after she filed a petition in bankruptcy. The *Hicks* court reached this decision by comparing the debtor's treatment from the employer before the petition with the treatment she received afterwards.

■ Applying this approach to the factual context here, McNeely's treatment after the proposed Chapter 11 plan changed from that he received prior to the plan's filing. Before the filing of the plan, even after the filing of the petition, Southland Timber generally had timber quotas from McNeely to cut and haul. Additionally, the evidence shows that Southland Timber's other contractors suffered no reduction in the amounts of timber they were authorized to cut and haul. It was also Southland's practice during periods of slower demand for timber to reduce every individual logger's quota to insure that all of their contractors had some work. In this case, McNeely received no quotas at all after February 1987 even though the timber mills were still buying logs and other contractors had quotas from McNeely. Because of these factors, it is evident that Southland Timber discriminated against McNeely with respect to employment.

■ In addition to proving the existence of discriminatory treatment, a debtor seeking relief under Section 525(b) must show that the discriminatory treatment resulted solely from (a) his or her status as a debtor; (b) his or her insolvency; or (c) because he or she has a debt dischargeable in bankruptcy. Southland Timber began denying McNeely timber quotas after McNeely's plan was filed and proposed paying Hutchison Financial interest of 9½% on McNeely's debt, rather than the contracted interest of 17½%. Facially, at least, this debt is dischargeable. McNeely, by showing that the discriminatory treatment followed so closely on the heels of the plan's treatment of the Hutchison debt, that he was informed that there would be no more quotas for him, and that he was willing to accept additional quotas, made a *prima facie* case that the failure to receive additional quotas from Southland Timber resulted solely because the contracted interest charge with Hutchison was changed in McNeely's Chapter 11 plan.

■ Southland Timber's efforts to overcome this *prima facie* case are not persuasive. Southland maintains that quotas were not given because McNeely's equipment needed repair. McNeely, nevertheless, continued to request quotas. Had quotas been given and had McNeely failed to cut and haul them, Southland would have had justification to terminate its contract with McNeely. Since Southland did not do so, the inference from the denial of quotas is that Southland intended to punish McNeely for reducing the interest payable to Hutchison under the plan.

Section 525(b) does not specify what remedies are available to an aggrieved debtor who shows that he or she has been discriminated against with respect to employment. Evidently, a court's power to fashion remedies is derived from Section 105(a) which grants the bankruptcy court power to enforce provisions of the Bankruptcy Code. 11 U.S.C. § 105(a). Courts have given debtors making a case under Section 525(b) a variety of types of relief, including injunctive relief and compensatory damages. See *In re Hopkins*, 66 B.R. 828, 833 (Bankr.W.D.Ark.1986) (discussing the variety of relief given debtors when governmental units discriminate against them with respect to employment).

■ McNeely has suggested that he be awarded the profits he would have earned during the five months remaining on the cut and haul contract at the time quotas ended. The testimony showed that McNeely typically had profits of $5,000.00 per month. This testimony went unchal-

lenged. However, it is difficult to conceive that McNeely would be involved in a Chapter 11 proceeding if he truly earned $5,000 profit a month. Further, due to broken equipment and his son's leaving the business when the Chapter 11 was filed, it would be speculative to adopt as a measure of damages the profits that were earned when the business was much more viable. Nevertheless, the monthly reports filed with this Court from the date of filing until February 1987 show that Debtor made a profit of approximately $2,000 per month *before* payments to Defendants. From February 1987 through September the profit was approximately $1,000 per month, without debt service payments. I, therefore, conclude that Debtor sustained approximately $1,000 per month in lost profits as a result of the termination of his quota. Awarding lost profits resulting from the discriminatory action is an appropriate remedy. *Cf. In re Terry,* 7 B.R. 880 (Bankr.E.D.Va.1980) (awarding back wages in a governmental unit discrimination case). Such an award shows employers that discriminatory actions with respect to employment will not be tolerated, and it places the aggrieved debtor in the position he would be in had the discrimination not occurred. Accordingly, McNeely is entitled to $5,000.00 in damages for lost profits resulting from Southland Timber's violation of Section 525(b).

ORDER

For the foregoing reasons IT IS THE ORDER OF THIS COURT that the Plaintiff's Counts I, III and V are dismissed.

IT IS FURTHER ORDERED that the Plaintiff is hereby entitled to recover:

1) $ 9,030.60   on Count II
2) $14,029.58   on Count IV
3) $ 5,000.00   on Count VI

   $28,060.18   Total

SO ORDERED.