In re Daynor A. STINSON, Debtor.

Daynor A. Stinson, Plaintiff,

v.

BB & T Investment Services, Inc., Defendant.

Bankruptcy No. 7–01–02631.
Adversary No. 7–02–00001.

United States Bankruptcy Court,
W.D. Virginia,
Roanoke Division.

April 26, 2002.

A. Carter Magee, Roanoke, VA, for debtor.

George I. Vogel, Roanoke, VA, trustee.

## DECISION AND ORDER

ROSS W. KRUMM, Bankruptcy Judge.

At Roanoke in said District this 26th day of April, 2002:

The issue before the court is whether 11 U.S.C. § 525(b)(1) prohibits discriminatory hiring by private entities. The complaining party alleges that a bank withheld an offer of employment solely because he had been a debtor under Title 11 of the United States Code. Moving to dismiss for failure to state a claim,[1] the bank contends that discriminatory hiring is not an event proscribed by 11 U.S.C. § 525(b). The court heard the parties in oral argument and considered the pleadings and authorities. For the reasons set forth below, the court will dismiss the complaint.

## BACKGROUND

The facts alleged in the complaint are as follows: Daynor A. Stinson (hereinafter Debtor) filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on June 11, 2001. The court entered a final decree and discharge order in the Debtor's case on September 11, 2001 and the case was closed.[2] In August and September of 2001, the Debtor interviewed with BB & T Investment Services, Inc. (hereinafter BB & T) for a position as an investment counselor. During the interview process, the Debtor was informed by Roger White, BB & T's regional manager, that BB & T wanted to hire the Debtor to work in the Lexington, Virginia area. Roger White told the Debtor that his hiring was contingent only on the processing of paperwork. At some time subsequent to a second interview, Roger White informed the Debtor that no offer of employment would be extended.[3]

The Debtor alleges that BB & T's refusal to extend an offer of employment was based solely on the fact that he had been a debtor under Title 11. The Debtor contends that BB & T's decision with respect to the Debtor's employment is in violation on 11 U.S.C. § 525(b)(1). The Debtor admits that § 525(b) does not explicitly outlaw discriminatory hiring, but argues that the prohibition in the statute against discriminating "with respect to employment" is broad enough to cover the factual situation set forth in the Debtor's complaint.

BB & T argues that since § 525(b) does not specifically include a refusal to hire in its anti-discrimination provision, there is no legal basis to support the complaint. BB & T further supports its position by juxtaposing subsections (a) and (b) of § 525, pointing out that subsection (a) specifically prohibits a governmental unit from refusing to hire; thus, the failure to specifically forbid discrimination in hiring in subsection (b) evinces Congress' intent to limit the anti-discrimination policy as it applies to hiring by private employers. The Debtor counters with the argument that the two code sections should not be compared because they were enacted at different times and were crafted by different draftsmen.[4]

---

1. Federal Rule of Civil Procedure 12(b)(6) ("failure to state a claim upon which relief can be granted") is made applicable to adversary proceedings by Rule 7012 of the Federal Rule of Bankruptcy Procedure.

2. On the Debtor's motion the case was reopened on February 12, 2002.

3. Consistent with the application of Fed. R.Civ.P. 12(b)(6), these facts are assumed true for the purpose of ruling on the motion.

4. Apart from the obvious fact that subsection (a) was enacted in 1978 and subsection (b) was enacted in 1984, the court did not see any authority for the "different scrivener" prong of this argument.

## ANALYSIS

■ The court's analysis begins with the text of the statute. The Bankruptcy Amendments and Federal Judgeship Act of 1984 amended 11 U.S.C. § 525 by adding subsection (b), which prohibits private employers from discriminating against Title 11 debtors.[5] In pertinent part, § 525(b) provides:

No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or bankrupt, solely because such debtor or bankrupt—

(1) is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act.

11 U.S.C. § 525(b).

BB & T relies on *Fiorani v. CACI*, 192 B.R. 401 (E.D.Va.1996) for the proposition that § 525(b) does not reach discriminatory hiring. In *Fiorani*, the court stated:

The statute's explicit reference to discrimination with respect to termination leaves no doubt that terminations are covered. But notably absent from the statute is any explicit reference to discrimination in hiring. This omission would be conclusive were it not for the statute's general reference to discrimination "with respect to employment" against one who has filed for bankruptcy, which reference arguably furnishes a basis for stretching the statute to cover hiring. Yet, this argument seems to stretch the statute too far, for if the reference to discrimination "with respect to employment" is read to cover hiring, it would, for the same reasons, seem that the phrase was also meant to reach termination. But it is quite apparent that this is not so, given that statute's framers found it necessary to make separate, explicit reference to termination. More likely, the phrase discrimination "with respect to employment" refers neither to hiring nor termination, but to other terms and conditions of employment.

*Fiorani*, 192 B.R. at 404–05. The *Fiorani* court supported its conclusion by comparing § 525(b) to § 525(a).

A comparison of the two provisions is instructive on the issue at bar. Subsection (a), which applies only to governmental units, states that a governmental unit may not "deny employment to, terminate the employment of, or discriminate with respect to employment against" a debtor or bankrupt. 11 U.S.C. § 525(a) (emphasis added). Thus, this portion of § 525 explicitly includes a prohibition against discrimination in hiring on the basis of an applicant's bankruptcy filing. By contrast, § 525(b), the private-employer provision, omits the prohibition of "denying employment" on the basis of an applicant's bankrupt status. This is compelling evi-

---

5. Prior to 1984, non-governmental employers were not prohibited from firing employees simply because they had received a discharge in bankruptcy. For example, in *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919 (5th Cir.1977), the court held that a company's termination of an employee who received a discharge in bankruptcy was not prohibited under the Supreme Courts holding in *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). In *Perez*, the Court held that a state may not refuse to renew a debtor's driver's license because the debtor was discharged of a tort judgment resulting from an automobile accident. Invoking the Supremacy Clause, the court stuck down state laws that impeded the application of the Bankruptcy Code. The Court recognized that the fresh start policies of the Bankruptcy Code would be frustrated by the discriminatory treatment resulting from an unpaid debt.

dence that § 525(b) does not reach hiring, for it is well established that where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acted intentionally and purposely in the disparate inclusion or exclusion."

*Fiorani*, 192 B.R. at 405.

The *Fiorani* court also relied on the textual cannon of interpretation *in pari materia*, stating when § 525(b) is read in juxtaposition to § 525(a) the conclusion is persuasive that Congress did not intend to "subject private employers to liability for choosing not to hire an applicant on the basis of his bankruptcy status." *Id.* at 405. The court rejected any reference to the legislative history of § 525(a) when interpreting § 525(b) because, quite simply, the legislative history pertains to subsection (a) not (b). The court was not satisfied that there was a sufficient nexus to link the legislative history of subsection (a) to subsection (b). The court also dismissed relying on § 525(a)'s legislative history because it implicitly discusses the Supremacy Clause by referring to the *Perez* decision, *supra* note 2, which clause is not relevant to private employers.

A majority of courts addressing this issue have held that § 525(b) does not reach discriminatory hiring by private employers. *See, e.g., Pastore v. Medford Sav. Bank,* 186 B.R. 553 (D.Mass.1995)(holding that § 525(b) does not provide a cause of action for failure to hire); *In re Hardy,* 209 B.R. 371 (Bankr.E.D.Va.1997) (requiring an employment relationship as a prerequisite for the applicability of § 525(b)); *In re Hopkins,* 81 B.R. 491 (Bankr.W.D.Ark. 1987) (holding § 525(b) reaches private employers only after an offer of full-time employment has been extended); *In re Madison Madison Intl. of Illinois,* 77 B.R.

678 (Bankr.E.D.Wis.1987) (stating § 525(b) does not apply to hiring decisions).

Despite an apparent consensus to the contrary, the Debtor argues that *Leary v. Warnaco, Inc.,* 251 B.R. 656 (S.D.N.Y. 2000) correctly interprets the breadth of § 525(b). In *Leary,* the debtor was offered employment subject only to a credit check. When the employer discovered the debtor's prior bankruptcy, it refused to hire her. The bankruptcy court dismissed the debtor's complaint for discriminatory hiring. On appeal, the district court reversed. The *Leary* court held that the plain meaning of the language "with respect to employment" is "clearly broad enough to extend to discriminating with respect to extending an offer of employment."

In reaching this conclusion, the *Leary* court rejected the analysis of courts, like *Fiorani,* which exclude discriminatory hiring from the scope of § 525(b).

This rather narrow construction of a remedial statute has been reached by drawing a negative inference comparing this statute with § 525(a). Section 525(a) states that the government may not "deny employment to, terminate the employment of or discriminate with respect to employment against" a person who has been a bankruptcy debtor. Section 525(b), while similar in language, does not contain the phrase "deny employment to." We are asked to infer from this omission not only that it was purposeful to achieve a disparate result where the Government is the employer, but that § 525(b) accordingly allows employers to discriminate on the initial hiring against those unfortunate economic casualties who are seeking or have obtained a fresh start from the bankruptcy court, and yet at the same time prohibits discrimination against those who have been hired.

*Id.* at 658. The *Leary* court declared that an application of the plain meaning of the statute to include discriminatory hiring is consistent with the purpose of § 525. "The evil being legislated against is no different when an employer fires a debtor simply for seeking refuge in bankruptcy, as contrasted with refusing to hire a person who does so. The 'fresh start' policy is impaired in either case." *Id.* "A Court should not go out of its way to place such an absurd gloss on a remedial statute, simply because the scrivener was more verbose in writing § 525(a)." *Id.*

This court is faced with two competing interpretations both claiming to be grounded in the plain meaning of the text. The court therefore must endeavor to interpret this statute that has led intelligent and reasonable courts to contradictory interpretations.

As an initial premise, "[w]here . . . the statute's language is plain, the sole function of the court is to enforce it according to its terms." *West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, 99, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (internal quotation marks omitted). The court's "task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, 'that language must ordinarily be regarded as conclusive.'" *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (discussing plain meaning rule). "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States v.*

*American Trucking Ass'ns, Inc.,* 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

At times a proposed interpretation of a statute that fulfills the purpose for which it was enacted cannot properly be given by a court because doing so arguably runs afoul of the constitutional limitations on a court's power. The Supreme Court case discussed below illustrates the tension between interpreting the words of a statute to give effect to the intent of a legislative body and respecting the constitutionally proscribed limitations of the judiciary's role.

In *West Virginia University Hospitals, Inc. v. Casey,* Justice Scalia stated "[t]he question before us, then, is— with regard to both testimonial and nontestimonial expert fees-whether the term 'attorney's fee' in [42 U.S.C.] § 1988 provides the 'explicit statutory authority' required by *Crawford Fitting* [*Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987)]."[6] The Court held that 42 U.S.C. § 1988, which permits the award of a "reasonable attorney's fee" in civil rights cases, does not concomitantly authorize an award of fees for expert services. Based on the record of statutory usage, Justice Scalia showed that attorney's fees and expert fees are separate elements in litigation costs. He relied on various federal statutes to make this point. For example, § 1988 refers only to attorney's fees whereas 15 U.S.C. § 2618(d) allows recovery of "the cost of suit and reasonable fees for attorneys and expert witnesses." *Casey,* 499 U.S. at 88, 111 S.Ct. 1138.

---

**6.** In *Crawford Fitting,* the Court held that 28 U.S.C. § 1821(b) and § 1920(3) completely define a federal court's authority to shift litigation costs, absent clear congressional authority to go beyond those provisions. *Crawford Fitting,* 482 U.S. at 439, 107 S.Ct. 2494.

The *Crawford Fitting* Court specifically announced its reluctance to find an implied repeal of sections 1821 and 1920 through Fed. R.Civ.P. 54(d) or other provisions not clearly addressing witness fees. *Id.* at 445, 107 S.Ct. 2494.

Justice Scalia stated that allowing "attorney's fees" to include "expert fees" would cause "dozens of statutes referring to the two separately [to] become an inexplicable exercise in redundancy." *Id.* at 92, 111 S.Ct. 1138. Justice Scalia rejected the imaginative reconstruction of congressional intent which posits that Congress would have included attorney's fees had it thought about it. Justice Scalia declared that it is not a court's "function to eliminate clearly expressed inconsistency of policy and to treat alike subjects that different Congresses have chosen to treat differently." *Id.* at 101, 111 S.Ct. 1138. Rejecting the argument that congressional purpose should prevail over the ordinary meaning of the statute, Justice Scalia stated

> [t]he facile attribution of congressional "forgetfulness" cannot justify such a usurpation. Where what is at issue is not a contradictory disposition within the same enactment, but merely a difference between the more parsimonious policy of an earlier enactment and the more generous policy of a later one, there is no more basis for saying that the earlier Congress forgot than for saying that the earlier Congress felt differently. In such circumstances, the attribution of forgetfulness rests in reality upon the judge's assessment that the later statute contains the better disposition. But that is not for judges to pre-

scribe. We thus reject this last argument for the same reason that Justice Brandeis, writing for the Court, once rejected a similar (though less explicit) argument by the United States: "[The statute's] language is plain and unambiguous. What the Government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function." *Iselin v. United States,* 270 U.S. 245, 250–251, 46 S.Ct. 248, 70 L.Ed. 566 (1926).

*Casey,* 499 U.S. at 101, 111 S.Ct. 1138.

Justice Stevens dissented based upon his view that the legislative history indicated a congressional desire that prevailing plaintiffs be made whole. Justice Stevens criticized the majority decision as anti-democratic, stating that the Court disserves democratic norms when it "puts on its thick grammarian spectacles and ignore[s] the available evidence of congressional purpose and the teachings of prior cases construing the statute." He opined that the Court does "country a disservice when [it] needlessly ignore[s] persuasive evidence of Congress' actual purpose and require[s] it . . . to restate its purpose in more precise English whenever its work product suffers from an omission or inadvertent error." *Casey,* 499 U.S. at 115, 111 S.Ct. 1138 (Stevens, J., dissenting).[7]

---

7. Approximately, 3 months later, the Court declined to follow Scalia's interpretation of a statutory term. In the case styled *Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), Justice Scalia was in the dissent. In this case, the issue before the court was whether the "results test" of the Voting Rights Act protects the right to vote in state judicial elections. *Id.* at 383, 111 S.Ct. 2354.

A class of African Americans brought a suit arguing that Louisiana's use of multimember districts diluted the voting strength of the minority community in violation of § 2 of the Voting Rights Act, as amended in 1982. Section 2 as amended removed the intent to discriminate requirement and adopted a results test. In pertinent part § 2 provides ". . . [a] violation . . . is established if . . . it is shown that the political processes leading to nomination or election . . . are not equally open to participation by members of a [protected] class . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect *representatives* of their

In the instant statute, the task of interpreting a statute to give effect to the will of Congress without overstepping the court's limited powers is not a facile undertaking. The plain text of § 525(b) does not explicitly provide that discriminatory hiring is prohibited. Admittedly, this court cannot unequivocally declare that, standing alone, the words "[n]o private

employer ... may discriminate with respect to employment" do not encompass discriminatory hiring.[8] Indeed, a reasoned opinion holds that the plain meaning of § 525(b) does, in fact, prohibit hiring based on individual's participation in Title 11.[9] *See Leary, supra. See also Comeaux v. Brown & Williamson Tobacco Co.*, 915 F.2d 1264 (9th Cir.1990).[10]

choice." 42 U.S.C. § 1973(b) (emphasis added).

Writing for the Court, Justice Stevens, rejected the contentions that the use of the term "representative" evidences a congressional intent to except from the statute vote dilution claims concerning judicial elections. Justice Stevens stated that if Congress had such an intent, it would have made it explicit in the statute, or at least mentioned it in the legislative history. Justice Stevens described "representatives" as winners of representative, popular elections and stated that if executive officers could be considered "representatives" merely because they are voted in by popular election, then the same logic brings elected judges into the scope of § 2. *Chisom*, 501 U.S. at 399, 111 S.Ct. 2354.

Dissenting, Justice Scalia stated that the Court erred in interpreting the statute because it did not "first, find the ordinary meaning of the language in its textual context; and second, us[e] established canons of construction, ask[ing] whether there is any clear indication that some permissible meaning other than the ordinary one applies." *Id.* at 404, 111 S.Ct. 2354. According to Justice Scalia, elected judges are not included in the ordinary meaning of "representative" and there is no good indication that the ordinary meaning of representatives should not apply. *Id.* at 414, 111 S.Ct. 2354. Justice Scalia rejected the Court's interpretation of § 2 based on what he describes as the "Court's conception of what Congress had in mind." *Id.* at 417, 111 S.Ct. 2354.

8. Transfers, demotions, or modifications to the employment terms of a debtor are, perhaps, illustrative of the most natural reading of "discrimination with respect to employment." *See, e.g., In re McNeely*, 82 B.R. 628 (Bankr.S.D.Ga.1987) (finding discriminatory treatment where the employer the debtor's reduced logging quotas).

9. There is a colorable argument, however, that the statute's use of the term "employment" precludes its application to discriminatory hiring. The term is used in the statute as a noun. Some of the synonyms associated with the noun "employment" include appointment, business, career, commission, job, labor, lifework, livelihood, means of livelihood, occupation, post, profession, task, trade, vocation, and work. William C. Burton, Legal Thesaurus 198 (Deluxe ed.1980). Used as a noun, the term does not appear to connote the time where an individual is attempting to secure a job. In other words, the term "employment" does not naturally include decisions and activities occurring before the time that the individual can be said to be in possession of a "career," "job," "labor," "occupation," "profession," or "trade." Had the statute used the verb employ, the case for discriminatory hiring would be much stronger than it now stands.

10. Addressing the plaintiff's § 525(b) claim that the defendant failed to hire him solely because of his status as a Title 11 debtor, the Ninth Circuit stated thusly:

In the instant case, *even if* B & W had made its final employment decision after it learned of the bankruptcy, B & W told Comeaux *before* it knew of the Chapter 13 filing that it would not hire him because of his credit history. n6 Thus, knowledge of the bankruptcy was clearly not the sole factor influencing B & W. Therefore, summary judgment for B & W was proper on this claim.

It is not clear whether the court is implicitly recognizing that § 525(b) covers hiring decisions or whether they merely restated the plaintiff's position when deciding the case.

Footnote 6 contained the following:

Comeaux did not allege in his complaint or appellate briefs that B & W had violated section 525(b)(3), that is, that B & W failed to hire him because he had not paid certain

On the surface, the *Leary* court's construction of the statute closely serves the purpose for which § 525 was enacted. An interpretation that 525(b) prohibits discriminatory hiring is, arguably, supported by the history of § 525. Section 525(a) was enacted to codify and expand the *Perez* ruling. In relevant part § 525(a) states:

[A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, ... solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act ....

The enumerations in § 525(a) are not intended to be an exhaustive list, rather the section was drafted to permit further development of prohibited discriminatory treatment. *See* Collier on Bankruptcy ¶ 525.01. When read as a starting point, and not a exclusive and circumscribed list, the enumerations in § 525(a) can be viewed as examples of prohibited discriminatory treatment and not the only instances thereof. The significance of omitted terms is minimized under this approach.

The legislative history to § 525(a) corroborates the above understanding and evinces a congressional concern that governmental entities be prohibited from interfering with a debtor's discharge and fresh start. As stated in Colliers, "[o]ne of the key purposes of section 525 is to pro-

tect the debtor's means of earning a livelihood." Collier ¶ 525.02[4]. The House and Senate Reports describe the effect and purpose of § 525(a), stating:

This section is additional debtor protection. It codifies the result of *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), which held that a State would frustrate the Congressional policy of a fresh start for a debtor if it were permitted to refuse to renew a drivers license because a tort judgment resulting from an automobile accident had been unpaid as a result of a discharge in bankruptcy.

The prohibition extends only to discrimination or other action based solely on the basis of the bankruptcy, on the basis of insolvency before or during bankruptcy prior to a determination of discharge, or on the basis of nonpayment of a debt discharged in the bankruptcy case (the *Perez* situation). It does not prohibit consideration of other factors, such as future financial responsibility or ability, and does not prohibit imposition of requirements such as net capital rules, if applied nondiscriminatorily.

In addition, the section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the *Perez* rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions, such as a State bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on

debts "dischargeable" under the bankruptcy statute. Absent more information, it is not possible for us to discern whether the debts listed on the credit report that led B

& W to change its mind about hiring Comeaux were "dischargeable" or "discharged" under the Act.

the basis of discharge of a debt to the union's credit union.

The effect of the section, and of further interpretations of the *Perez* rule, is to strengthen the anti-reaffirmation policy found in section 524(b). Discrimination based solely on nonpayment could encourage reaffirmations contrary to the expressed policy.

H. Rep. No. 95–595, 95th Cong., 1st Sess. 366–67 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5963, 6322–6323; S.Rep. No. 989, 95th Cong., 2d Sess. 81 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5867. The Senate Report further states that courts "will continue to mark the contours of the antidiscrimination provision in pursuit of sound bankruptcy policy." *Id.* "In short, a governmental unit may not discriminate against a person in ways that will frustrate the fresh start policies of the Code." Colliers on Bankruptcy ¶ 525.02.

Clearly, the purpose of § 525(a) is to prevent discriminatory conduct by the government. Such a prohibition is essential to allow the purposes of the Bankruptcy Code to be fulfilled. *See Perez*, 402 U.S. at 648, 91 S.Ct. 1704 ("This Court on numerous occasions has stated that 'one of the primary purposes of the bankruptcy act' is to give debtors 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' ").

Subsection (b) was amended into § 525 to further the policy embodied in § 525(a); namely, to protect the debtor's ability to earn a livelihood. *See* Collier ¶ 525.02[4]. In light of the clear and obvious purpose of § 525, the argument rejecting a broad interpretation of § 525(b) based on the fact that there is no apparent nexus between the legislative history of § 525(a) and § 525(b) appears unwarranted. *See Fiorani*, 192 B.R. at 406. Instead of asking

how a court can link subsection (b) to (a) based on the legislative history, perhaps the more salient question is whether there is any reasonable basis for believing that subsection (b) was purposefully enacted to achieve a more limited goal than subsection (a).

The evil prohibited by § 525 is discrimination based upon a person's participation in Title 11, all other things being equal. The prohibition against discrimination is designed to prevent the frustration of the fresh start by the government, private employers, or educational lending institutions. In this respect, interpreting § 525(b) to cover discriminatory hiring is more consistent with the thrust of § 525 taken as a whole, since it forbids grounding decisions solely on the fact that individual was or is a Title 11 debtor.

However, the fact that the result reached by the Debtor's interpretation more fully advances the apparent goals of § 525 does not necessarily mean that the court should interpret the statute to reach that goal. In the final analysis, the words in the statute do not permit the court to interpret the statute to prohibit discriminatory hiring, however laudable that result may appear. The court believes that to interpret the statute as the Debtor requests would require this court to step beyond its constitutionally proscribed function. When the statute is read as a whole, meaning a reading that does not confine itself to a portion of one subsection, the Debtor's interpretation is not tenable because it does harm to other provisions in § 525. *United States v. Penn*, 17 F.3d 70 (4th Cir.1994) ("[I]t is fundamental rule of statutory construction that all parts of a statute must be read together.").

"When interpreting a statute, the court will not look merely to a particular clause in which general words may be

used, but will take in connection with it the whole statute ... and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature." *Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974). *See* 2A Sutherland, Statutes and Statutory Construction § 47.02, at 139 (5th ed., Norman Singer ed.) (endorsing the whole act rule). Under this approach, the court must heed "the cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States,* 485 U.S. 759, 778, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (plurality opinion by Scalia, J.).

If the phrase "with respect to employment" covers hiring decisions, then provisions in § 525(a) and (b) become an exercise in redundancy. *See Casey,* 499 U.S. at 101, 111 S.Ct. 1138. The court cannot ascribe a substantive meaning to the terms "deny employment to" in § 525(a) if "discriminate with respect to employment" is read to encompasses discriminatory hiring. The explicit inclusion of the phrase "deny employment to" in § 525(a), preceding the phrase "discriminate with respect to employment," leads this court to concluded that Congress believed the phrases offered different protections to a Title 11 debtor. To interpret "discriminate with respect to employment" in § 525(b) to mean that a private employer may not deny employ-

ment to a Title 11 debtor would create unwarranted superfluousness in subsection (a).

Similarly, the *Fiorani* court rejected a reading that would harm provisions in subsection (b). If, in subsection (b), "discriminate with respect to employment" covers hiring decisions, then there is no cogent argument why it would not also cover decisions regarding terminations as well. *See Fiorani,* 192 B.R. at 404–05. The Debtor's interpretation would cause the anti-termination provision in subsection (b) to be unnecessarily redundant.

The court believes that the result reached by the *Fiorani* court is proper. Analyzing the subsections *in pari materia* also supports an interpretation that "discrimination with respect to employment" does not cover hiring decisions.[11] The Debtor cites *United States v. Mitchell,* 39 F.3d 465 (4th Cir.1994) as an example of the Fourth Circuit's reluctance to rely on disparate inclusions or exclusions of language in a statute.

The issue before the *Mitchell* court was whether the term "law" in 18 U.S.C. § 545 encompassed legislative acts and administrative regulations. The appellant in *Mitchell* argued that "contrary to law" should be limited to legislation passed by Congress and should not include agency regulations. The Fourth Circuit held that 18 U.S.C. § 545 reaches conduct contrary to Fish and Wildlife Service regulations

---

**11.** The court recognizes, however, that there is a response to every canon employed to reach a certain interpretation. Karl Llwellyn illustrated in *Remarks on the Theory of Appellate Decision and the Rules of Canons about how Statutes are to be Construed,* 3 Vand. L.Rev. 395, 401–06 (1950) a number of parries to asserted canons of interpretation. For example, the canon that a statute cannot be applied beyond its text is cast against the principle that to effect its purpose a statute may be implemented beyond its text. The canon that statutes *in pari materia* must be construed together is subject to the exception that statutes are not *in pari materia* if the scope and aim are distinct or where the design to depart from the general purpose or policy of the previous statute is apparent. The canon that if language is plain and unambiguous it must be given effect is countered by the desire to avoid literal interpretations if doing so leads to absurd results or thwarts the manifest purpose of the statute.

that have the force and effect of law. In doing so, the court noticed that "law" was not defined in the statute; thus, the court gave the term its ordinary meaning, which commonly includes administrative regulations. The *Mitchell* court recognized the well-settled principle announced in *Chrysler Corp. v. Brown*, 441 U.S. 281, 295–96, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979): "It has been established in a variety of contexts that properly promulgated, substantive agency regulations have the 'force and effect of law.'" According to the *Mitchell* court, it would take a clear showing of contrary legislative intent before the phrase "contrary to law" could be held to encompass a narrower ambit than the ordinary and traditional understanding. *Id.* at 468.

The *Mitchell* court rejected the appellant's reliance on various provisions in the 1922 and 1930 Tariff Acts that refer to "law and regulations." The *Mitchell* court discussed the Supreme Court's pronouncement in *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." First the court noted that the presumption loses force when the sections in issue are scattered within a lengthy and complex act. *Mitchell*, 39 F.3d at 470. More importantly, the court pointed out that the terms "law and regulations," which were apparently enacted after the terms in § 545, were not used in the context of conduct "contrary to law" and that the legislative history to the new sections did not indicate to the court that Congress intended to limit the meaning of "contrary to law" *Id.* The court also recognized the presumption that Congress adopts judicial interpretations when it re-enacts a statute without modifications. Thus, without clear evidence of Congress' intent to the contrary, the Fourth Circuit was unwilling to ascribe an untraditionally narrow definition to the terms "contrary to law." *Id.*

Although the *Mitchell* decision is well-reasoned and sound, the court is not convinced that the principles announced therein advance the Debtor's position. The Debtor's exegesis of *Mitchell* is too narrow: the reasons why the *Mitchell* court did not find an omitted phrase significant are not present here. The Debtor did not show that his proposed interpretation is the traditional and understood meaning of the terms in question. In fact, most courts have not interpreted the language as the Debtor does. Also, the phrases here are used in the same context (prohibited discriminatory conduct) and in the same section; thus, the presumption announced in *Russello* appears more applicable than in *Mitchell*. In *Mitchell* the phrases analyzed when applying the *Russello* presumption were apparently scattered throughout the statute and were not used in the same context. For that reason, and in light of the traditional meaning of "law" previously announced in judicial decisions, the *Mitchell* court was not persuaded that Congress intended to narrowly use the term. The court finds that the *Mitchell* case is distinguishable from the matter *sub judice*.

Reading § 525(b) to except discriminatory hiring maintains internal congruity and avoids needless redundancies when § 525 is read in its entirety. It is not necessarily an anomaly to find that § 525(b) offers less protections than § 525(a). A respected treatise recognizes that § 525(b) is more narrow in scope than § 525(a). *See* Norton Bankruptcy Law and Practice § 50:2 ("The prohibition [in § 525(b)] is limited to discrimination in employment and is not, therefore, as broad as the ban on govern-

mental discrimination in Code § 525(a)"). Code § 525(a) extends protections to hiring, termination, and discrimination in employment while Code § 525(b) makes no reference to hiring. Also, while § 525(a) protects a "person" (which under 11 U.S.C. § 101, includes individuals, partnerships, and corporations), Code § 525(b) protects only "individuals." Furthermore, the analysis of *Fiorani* and the presumption discussed in *Russello* tip the scales in favor of this court's interpretation of Code § 525(b). Even if the Debtor's reading of § 525(b) is more palatable and better serves the fresh start policies of the Bankruptcy Code, the court cannot give the statute a meaning that harms the text enacted by Congress and signed by the President.

### CONCLUSION

Section 525(b) prohibits discrimination with respect to employment, but this prohibition does not include hiring decisions. When § 525 is read as a whole, the court cannot interpret "with respect to employment" without causing redundancies and surplusage. Although the result reached by the Debtor's interpretation may be desirable, the task of achieving that end is better left to Congress, not this court. Accordingly, it is

### ORDERED:

That the Motion to Dismiss is GRANTED.

A copy of this order is directed to be sent to W. Calvin Smith, Esquire, Counsel for the Debtor, P.O. Box 404, Roanoke, Virginia 24003–0404; to Kevin Oddo, Esquire, Counsel for BB & T, 1800 First Union Tower, P.O. Drawer 1200, Roanoke, Virginia 24006; and to Edward Katze, Esquire, Counsel for BB & T, 230 Peachtree Street, N.W., Suite 2400, Atlanta, Georgia 30303–1557.